## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Pierre A. Dahmani, | |
| Plaintiff, | Case No. 23 CV 04448 |
| v. | Honorable Nancy L. Maldonado |
| SHL Medical AG, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pierre A. Dahmani initiated this action against Defendant SHL Medical AG ("SHL Medical") bringing an individual claim for breach of fiduciary duty, a derivative claim for breach of fiduciary duty, and a derivative claim for accounting. (Dkt. 5-1.)[1] After timely removing this case to federal court on diversity grounds, SHL Medical filed a motion to dismiss Dahmani's Complaint. (Dkt. 29.) SHL argues that Dahmani's Complaint should be dismissed under the forum non conveniens doctrine and, alternatively, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated in this Memorandum Opinion and Order, the Court grants SHL Medical's motion to dismiss for forum non conveniens. The Court therefore will not address SHL Medical's separate Rule 12(b)(6) motion. The case is dismissed.

## Background[2]

Plaintiff Pierre A. Dahmani is one of three of the original founding members of the QuiO Corporation ("QuiO"), a Delaware limited liability company. (Dkt. 5-1 ¶¶ 1, 9.) QuiO was created to develop, market, manufacture, and sell the SiOne Smart Injector medical device, which is a digital injector that can control the timing of injections and the injection process and monitor patient dosages. (*Id.* ¶ 10.) Dahmani is currently a citizen of Michigan and has a 9.855% ownership interest in QuiO. (*Id.* ¶ 1.)

Defendant SHL Medical is a Swiss corporation that is the successor in interest to, and assignee, of SHL Group, LTD ("SHL Group"). (*Id.* ¶ 3.) SHL Group is a limited liability company that was founded by SHL Medical as a single-purpose entity to serve as an instrumentality and vehicle for investment into QuiO; SHL Group was thus previously a member of QuiO. (*Id.* ¶ 6.) SHL Medical, however, was eventually substituted for SHL Group as a member of QuiO. (*Id.*) (*Id.* ¶ 2–3.)

---

[1] In citations to the docket, page numbers are taken from the CM/ECF headers.
[2] The Court takes the factual background from the well-pled allegations in the Complaint (Dkt. 6) and assumes the allegations to be true for the purposes of the instant motion. *See, e.g., Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 648 (7th Cir. 2017).

Dahmani alleges that SHL Medical and SHL Group are part of a larger and complex group of related corporate entities (collectively, "SHL") that have an "opaque" corporate structure. (*Id.*) SHL develops and manufactures drug delivery systems, and SHL Medical is SHL's main operating company. (*Id.* ¶ 8.) SHL Medical is owned by Roger Samuelsson, a Swedish citizen. (*Id.* ¶ 3.)[3] SHL Medical manufactures medical devices such as pen injectors, auto injectors, and inhaler systems. (*Id.*) The SiOne Smart Injector, which QuiO was meant to develop, was a potential digital substitute for the mechanical injectors that make up SHL's main product line. (*Id.* ¶ 10.)

While QuiO was still in its infancy, SHL Medical approached QuiO with a funding offer through Dr. Ramin Raffei, a representative of SHL Medical. (*Id.* ¶¶ 15–19.) Dr. Raffei not only expressed interest in providing QuiO with funding, but also asked the QuiO founders, including Dahmani, whether they would be interested in entering into a partnership with SHL Medical. (*Id.* ¶¶ 15–20.) Through the proposed partnership, the QuiO founding members hoped to obtain financial, technical, manufacturing, and marketing support from SHL Medical so that they could develop the SiOne Smart Injector and bring it to market. (*Id.* ¶ 20.) Following SHL Medical and QuiO's initial meeting, the QuiO founders and SHL Medical had several subsequent meetings, visited SHL Medical's facilities, and eventually met with Samuelsson. (*Id.* ¶¶ 22–23.)

Dahmani alleges that, over the course of these meetings, which took place in Taiwan and Sweden, the "essentials" of QuiO and SHL's deal were established. (*Id.* ¶¶ 22–24.) Specifically, Dahmani contends that SHL agreed to invest $15 million in QuiO (based on SHL's estimate of the development cost of the SiOne hardware and associated software platform). (*Id.*) In exchange, SHL would obtain a 51% stake in QuiO, but there would be an equal split in representation on the Board of Managers between SHL and the QuiO founders. (*Id.*) Dahmani alleges that Samuelsson and his executives explicitly represented to the QuiO founders that SHL would provide monetary support, "engineering and technical support for product development, help with regulatory approval, and ultimately, contract with QuiO to manufacture the product." (*Id.* ¶ 25.)

Eventually, QuiO and SHL memorialized the partnership in Chicago, Illinois on October 17, 2017, in a series of documents: (1) an Amended and Restated Operating Agreement; (2) a Subscription Agreement; (3) a Cooperation Agreement; and (4) a Service Agreement. (*Id.* ¶¶ 24, 26.) These documents reflected QuiO and SHL's agreement that SHL would invest $15 million in QuiO, in the form of $10 million in cash and $5 million in "in-kind services" (such as engineering and development support). (*Id.* ¶ 28.) In return, SHL became a member of QuiO holding a 51% share of the LLC. (*Id.*) Subsequently, a Second Amended and Restated Operating Agreement ("Second Operating Agreement") was executed, and it included a provision stating that SHL's 51% interest in QuiO could not be diluted without SHL's consent. (*Id.* ¶ 29.) Additionally, the Second Operating Agreement stated that "QuiO's day-to-day affairs shall be conducted by a Board of Managers, consisting of two Managers appointed by the Founders and two managers appointed by SHL," but that one of SHL's managers would be the Chairman, who would have a tiebreaking vote. (*Id.*) After the parties formalized their agreement, SHL invested the $10 million in cash in QuiO, and QuiO began applying for patents, seeking regulatory approval, and developing the product. (*Id.* ¶ 31.)

---

[3] The Court notes that Dahmani's Complaint is somewhat unclear on whether Samuelsson owns all the SHL entities or only SHL Medical. That distinction, however, is ultimately immaterial to the Court's resolution of the parties' dispute.

Soon thereafter, SHL and QuiO began to run into problems as QuiO felt that SHL's manufacturing expertise and offerings were below the QuiO founders' expectations and proved more expensive than anticipated. (*Id.* ¶¶ 32, 34–35.) One of QuiO's complaints was that although SHL granted QuiO a $5 million credit for engineering and manufacturing services, SHL ended up charging QuiO for many services. (*Id.* ¶ 35.) QuiO was eventually required to pause the hardware development of the SiOne product, (*id.* ¶ 43), and the Board of Managers agreed that SHL should convert some of its $5 million in "in-kind services" to fund an internal engineering team. (*Id.*) Accordingly, SHL provided a cash infusion of $1.128 million to QuiO (which was taken from the initial $5 million capital contribution of "in-kind services"); the cash infusion was memorialized by Amendment No. 1 to the QuiO Subscription Agreement ("Amendment No. 1"). (*Id.* ¶ 44.)

Around the same time, EGT Group, a private equity firm, obtained a 20% minority stake in SHL Medical's holding company. (*Id.* ¶ 46.) After the $1.128 million was exhausted and EQT had invested in SHL, SHL Medical refused to put any more money into QuiO, despite the QuiO founders' repeated requests for additional cash infusions. (*Id.* ¶¶ 47, 49.) Further, SHL Medical refused to consider alternative sources of funding and to waive its antidilution rights. (*Id.*) Consequently, product development on the SiOne Smart Injector ceased, all employees were terminated, and QuiO was forced to give up its leased space. (*Id.* ¶ 51.) Nevertheless, QuiO engineers finished the software development process for the SiOne Smart Injector without pay, and the QuiO founders were able to find prospective customers who were interested in licensing the software platform. (*Id.* ¶ 53.) Dahmani claims that, although SHL Medical "knew QuiO was very close to generating substantial revenue from operations," it still refused to provide further funding, and SHL Medical's refusal prevented QuiO from engaging in business with these prospective clients. (*Id.* ¶¶ 54, 69(C).) Finally, Dahmani claims that SHL has been using QuiO's intellectual property in coordination with EQT and that SHL has been using QuiO's hardware technology (covered by Qui's pending patent applications) in its own patent applications. (*Id.* ¶¶ 63, 65.)

Based on the above, Dahmani initiated this action in Cook County Court on June 13, 2023. (Dkt. 5-1.) Dahmani brings breach of fiduciary duty claims on an individual and derivative basis. (Dkt. 5-1 ¶¶ 66–78.) Specifically, Dahmani alleges that SHL Medical breached their fiduciary duty to the other QuiO members and QuiO itself by failing to perform its obligation to QuiO to fund its development expenses, failing to provide QuiO the full $15 million it promised, denying QuiO funding when QuiO was at the brink of generating substantial revenue, pretending that QuiO was not economically viable, refusing to provide QuiO with additional capital or to waive its antidilution rights, and misappropriating QuiO's intellectual property. (Dkt. ¶¶ 69(A)–(E)). He further seeks an accounting on a derivative basis. (*Id.* ¶¶ 79–83.) After SHL Medical timely removed this case to federal court on diversity jurisdiction grounds, SHL Medical filed the instant motion to dismiss. (Dkt. 29.)

## Discussion

SHL Medical argues that the Court should dismiss Dahmani's Complaint pursuant to the forum selection clauses in the contracts memorializing SHL Medical's investment in QuiO, which require the parties to litigate in Delaware state court. (Dkt. 30.) In support of its motion, SHL Medical attaches the Subscription Agreement, the Second Operating Agreement, the Cooperation

Agreement, and Amendment No. 1. (Dkts. 30-1, 30-2, 30-3, 30-4.) In response, Dahmani argues that the forum selection clauses should not be enforced against him because they do not cover his breach of fiduciary duty claims. (Dkt. 37 at 6–9.)

"A forum-selection clause channeling litigation to a nonfederal forum is enforced through the doctrine of forum non conveniens." *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 893 (7th Cir. 2018) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for the W. Dist. Of Tex*, 571 U.S. 49, 60 (2013)). "Under the doctrine of *forum non conveniens*, a court has the direction to dismiss a case over which it normally has jurisdiction if in doing so 'it best serves the convenience of the parties and the ends of justice.'" *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1192 (N.D. Ill. 2014) (quoting *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997). Generally, a court decides whether to dismiss a case under the forum non conveniens doctrine by inquiring into: (1) whether an alternative forum exists that is available, adequate, and has jurisdiction over the case; and (2) whether the relevant private and public interests favor dismissal. *Id.* Typically, courts afford substantial deference to a plaintiff's choice of forum. *Deb v. SIRVA, Inc*., 832 F.3d 800, 806 (7th Cir. 2016). If, however, a valid forum selection clause governs the dispute, a court "should not consider arguments about the parties' private interests" as the parties, by agreeing to the forum selection clause, have "waive[d] the right to challenge the preselected forum as inconvenient or less convenient[.]" *Atl. Marine Const. Co*., 571 U.S. at 64.

As a preliminary matter, the parties dispute whether the Court should apply federal or Illinois law to this dispute. SHL asserts that federal law is applicable, while Dahmani asserts that Illinois law is applicable. (Dkt. 37 at 6; Dkt. 38 at 4, n. 5.) The reality is slightly more complicated.

The Seventh Circuit has held that where parties have a forum selection clause, the Court should interpret the clause using the law chosen by the parties to govern the rest of the relevant contract (*i.e*., the choice of law provision in that agreement). *Abbott Lab'ys v. Takeda Pharm. Co*., 476 F.3d 421, 423 (7th Cir. 2007) ("Simplicity argues for determining the validity and meaning of a forum selection clause . . . by reference to the law of the jurisdiction whose law governs the rest of the contract in which the clause appears."); *Jackson v. Payday Fin., LLC*, 764 F.3d 765 (7th Cir. 2014) ("In contracts containing a choice of law clause, therefore, the law designated in the choice of law clause would be used to determine the validity of the forum selection clause."); *Pro. LED Lighting, Ltd. v. Aadyn Tech., LLC*, No. 14-CV-2440, 2014 WL 6613012, at *5 (N.D. Ill. Nov. 21, 2014) ("Because the Non-Exclusive Representative Agreement also includes a choice of law provision, the Court looks to Florida law for determining the forum selection's meaning."); *Sonova USA Inc. v. Fuel Med. Grp., LLC*, No. 22-CV-7055, 2023 WL 5302014, at *2 (N.D. Ill. June 12, 2023) ("In determining the validity of a forum selection clause, the Court applies the parties' contractual choice of law, where present.").

Here, the attached contracts not only have forum selection clauses, but also choice of law provisions stating that Delaware law governs the agreements. (Dkt. 30-1 at 10; Dkt. 30-2 at 29; Dkt. 30-3 at 2l; Dkt. 30-4 at 24.) The parties do not dispute the validity of the relevant choice of law provisions in the contracts. The Court will therefore apply Delaware law in determining whether the forum selection clauses in the contracts between SHL Group and QuiO cover Dahmani's breach of fiduciary claims.

As will be discussed in greater detail below, ultimately, the Court concludes that the forum selection clauses in QuiO and SHL Medical's contracts warrant dismissal of Dahmani's Complaint. Having found that the relevant forum selection clauses are enforceable, typically, the Court's next step would be to conduct a forum non conveniens analysis without consideration for either party's private interests. Dahmani, however, predominantly relies on the private interest factors in his briefing. Ultimately, whether the Court accounts for his private interests in its forum non conveniens analysis is immaterial, as the Court finds that dismissal would be proper here either way.

## I.     Applicability of the Forum Selection Clauses

The Court will first discuss whether Dahmani's breach of fiduciary duty claims should be dismissed based on the forum selection clauses. The parties mainly focus on the Subscription Agreement and the Second Operating Agreement. The Subscription Agreement and Second Operating Agreement use the same language in their respective forum selection clauses, which states, in relevant part, that:

> Any dispute, controversy, difference or claim arising out of, relating to or in connection with this Agreement, or the breach, termination or invalidity thereof, shall be submitted to the courts of Delaware, which has full jurisdiction to settle the dispute in the first instance.

(Dkt. 30-1 at 10; Dkt. 30-2 at 30.)[4] Dahmani contends that SHL Medical is not a signatory to these contracts and, even if it were, the forum selection clauses do not encompass his breach of fiduciary duty claims, which are brought separately from the obligations formalized in the Subscription Agreement and Second Operating Agreement. (Dkt. 37 at 5–9.)

Under Delaware law, forum selection clauses are presumptively valid and enforceable. *Salzberg v. Sciabacucchi*, 227 A. 3d 102, 132–33 (Del. 2020) (noting that Delaware state courts and United States Supreme Court precedent "requires courts to give as much effect as possible to forum-selection clauses and to 'only deny enforcement of them to the limited extent necessary to avoid some fundamentally inequitable result or a result contrary to positive law.'") (citations omitted).

When evaluating the scope of a forum selection clause, Delaware courts first decide whether the clause in question is broad or narrow. *ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, No. CIV.A. 6562-VCP, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011). To determine whether a forum selection clause is broad, courts look at the language of the provision, and they have held that clauses, which expressly cover "all claims between the contracting parties that 'arise out of' or 'relate to' a contract," are broad. *Id.* When parties have agreed to a broad forum selection clause, parties are obligated to bring non-contractual claims in the provided-for forum so long as those claims "touch on contract rights or contract performance." *Id.*

---

[4] The Amendment No. 1 also contains the same forum selection clause. (Dkt. 30-3 at 2.)

In the context of breach of fiduciary duty claims in particular, Delaware courts determine whether such claims are included in a contract's forum selection clause by determining whether the alleged fiduciary duty was created by virtue of said contract. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002) (holding that arbitration provision did not encompass breach of fiduciary claim because "[t]he fiduciary duties Xcelera owes Parfi are beyond the contract and rest on an independent set of rights provided for in the Delaware corporation law."); *see also ASDC Holdings*, 2011 WL 4552508, at *4 ("This Court treats forum selection clauses 'in the same spirit' as arbitration clauses; thus, the same general principles apply in determining the scope and level of deference to be given either kind of clause.") (citation omitted). In other words, these courts ask whether the plaintiff would have an independent cause of action for breach of the fiduciary duty apart from the agreement containing the forum selection clause. *See NB Alternatives Advisers LLC v. VAT Master Corp.*, No. CV 2020-0930-SG, 2021 WL 1998475, at *2 (Del. Ch. May 19, 2021) ("Because the Plaintiffs argue that the Delaware forum selection clause should apply to Count IV, the question is whether Count IV would be assertable absent the Operating Agreement in which the Delaware forum selection clause is found."); *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, No. CV 2021-0288-JTL, 2021 WL 3630298, at *1082–83 (Del. Ch. Aug. 17, 2021).

In view of the Delaware law stated above, the Court finds that Dahmani would not be able to assert his breach of fiduciary claim unless the Subscription Agreement and the Second Operating Agreement existed. The Court therefore holds that the forum selection clauses contained therein mandate dismissal of Dahmani's claims.[5] First, Dahmani himself alleges that SHL Medical owes Dahmani a fiduciary duty by token of the Subscription Agreement and the Second Operating Agreement. Dahmani contends that SHL Medical is a controlling member of QuiO—and thus has a fiduciary duty to QuiO and its other members—because it owns 51% un-dilutable "Class A" units in QuiO, has two managers on a four-manager board, and controls the chairman position, which, in turn, maintains the tiebreaking vote. (Dkt. 5-1 ¶ 66.) The Subscription Agreement granted SHL Medical its 51% share of "Class A" shares in QuiO, (Dkt. 30-1 at 1), and the Second Operating Agreement granted SHL Medical its antidilution rights, board seats, and chairman position (with its concomitant tiebreaking vote). (Dkt. 30-2 at 9–11, 16.) SHL Medical's fiduciary duty thus grows out of these contracts with QuiO, and Dahmani's breach of fiduciary duty claims necessarily arise from those agreements. *See Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006) (holding that breach of fiduciary duty claim was subject to arbitration clause in limited liability company's governance document, because the document gave rise to the breach of fiduciary claim).

Second, Dahmani's specific allegations of how SHL Medical breached its fiduciary duty demonstrate that his claims arise from the Subscription Agreement and Second Operating Agreement. Dahmani alleges—in varying ways—that SHL Medical breached its fiduciary duty to Dahmani and QuiO by failing to follow through on its promise to fund QuiO and by failing to provide QuiO with further funding. (Dkt. 5-1 ¶ 69(A)–(D).) But each characterization of SHL

---

[5] As stated above, the Court finds that dismissal of Dahmani's complaint is warranted under both the forum selection clause and the doctrine of forum non conveniens. Accordingly, despite Dahmani's assertion that SHL Medical is not a signatory to the relevant contracts, the inference that SHL Medical has the right to enforce the contracts is reasonable when Dahmani himself alleged in his Complaint that "Defendant is the successor in interest to, and assignee of" SHL Group (the party that actually signed the contracts). (Dkt. 5-1 ¶ 3.)

Medical's alleged breach of fiduciary duty inevitably runs up against either the Subscription Agreement or the Second Operating Agreement. For example, Dahmani alleges that SHL breached its fiduciary duty by failing to meet its commitment to fund QuiO's development costs and to provide the full $15 million in capital funding that it promised QuiO. (*Id.* ¶¶ 69(A)–(B)). These allegations, however, squarely rest on the Subscription Agreement, which memorialized these obligations. Similarly, Dahmani alleges that SHL Medical breached its fiduciary duty by failing to waive its antidilution rights; SHL Medical's antidilution rights, however, again only exist due to the Second Operating Agreement. (*Id.* ¶ 69(D).)

Finally, Dahmani's derivative action claim against SHL Medical for breach of fiduciary duty cements the fact that Dahmani's breach of fiduciary duty claims stem from the Subscription Agreement. As part of the equitable relief sought, Dahmani asks the Court for "an order that [SHL Medical] contribute the balance due under the Subscription Agreement in cash rather than services pursuant to [Delaware law]." (*Id.*) This requested relief thus undoubtedly demonstrates that Dahmani's breach of fiduciary duty claim is predicated on the Subscription Agreement itself. It is incongruous for Dahmani to claim the forum selection clauses do not apply while he simultaneously seeks relief based on the contracts that contain the agreements.

## II. Forum Non Conveniens Analysis

Having concluded that the forum selection clauses apply to Dahmani's breach of fiduciary duty claims, the Court will now conduct the forum non conveniens analysis to determine if Dahmani's claim should be dismissed. As stated above, after finding an enforceable forum selection clause, the Court would ordinarily ignore the parties' arguments regarding their private interests. In light of Dahmani's extensive discussion of the private interest factors, while not necessary, the Court will consider the factors, which compel the same result – dismissal.

When applying the doctrine of forum non conveniens, the Court first asks whether an alternative forum is available. "An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *GoldenTree Asset Mgmt.* LP, 64 F. Supp. 3d at 807 (quoting *Kamel*, 108 F.3d at 803). The parties do not dispute this element, nor could they considering that Dahmani is asking the Court to apply Delaware law and that one of the remedies he seeks is dissolution of QuiO pursuant to Delaware law. (*See* Dkt. 5-1 ¶ 78). The Court therefore finds that Delaware state court is an available and adequate alternative forum.

The second element of the forum non conveniens inquiry is an examination of the private interests of the plaintiff, which include: "(1) relative ease of access to sources of proof; (2) availability of compulsory process and costs for attendance of witnesses; (3) possibility of viewing the premises, if appropriate; and (4) other practical issues, including the ease of enforcement of any ultimate judgment." *Deb*, 832 F.3d at 807. The parties did not fully brief this issue: SHL Medical assumed that the forum selection clause encompassed Dahmani's entire claim and thus went straight to weighing the public interests. (Dkt. 30 at 13.) Dahmani emphasized that litigating this matter in Illinois would be far more convenient for him, that Illinois has a stronger connection to the events underlying his claims, and pointed out that SHL Medical did not argue against any private interests, thus making these factors "at best neutral." (Dkt. 37 at 2–4.)

Before discussing the private interest factors, the Court notes that while courts typically afford substantial deference to a plaintiff's choice of forum, "[w]hen a plaintiff's choice is not his home forum . . . the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'" *Id.* at 806. As Dahmani is a Michigan citizen, his choice to bring this litigation in Illinois thus dilutes the deference ordinarily given to a plaintiff's choice of forum.

Further, the Court finds that the private interest factors are neutral with respect to litigating this action in Illinois. As to the first and second factors, because the parties do not provide any information on where relevant information is housed or witnesses reside, the Court cannot ascertain the cost or inconvenience of gathering or producing evidence. SHL Medical, however, is located in Switzerland, and the Court reasonably infers that at least some of the necessary proofs would come from abroad. Nevertheless, Dahmani, despite being a Michigan citizen, argues that it would be more convenient for him to come to Chicago; convenience is an important consideration in the forum non conveniens analysis. (*Id.* at 4, n.3); *In re Bridgestone/Firestone, Inc.*, 190 F. Supp. 2d 1125, 1128 (S.D. Ind. 2002) ("[T]he central focus of the forum non conveniens inquiry is convenience.") (quoting *Piper Aircraft Co v. Reyno*, 454 U.S. 235, 249 (1981)). The third element, possibility of viewing the premises, is inapplicable here, as there is no specific physical setting or locale at issue for Dahmani's claims. Finally, as to the fourth factor, ease of enforcement of any judgment, the Court finds that this factor weighs in favor of dismissal because Dahmani requests the dissolution of QuiO under Delaware law. Thus, on balance, the private interests here appear neutral at the least.

The Court, however, finds that the public interests in this case strongly weigh in favor of dismissal. The public interest factors of a forum non conveniens analysis include: "(1) docket congestion and likelihood to proceed to a speedy trial, (2) each court's relative familiarity with the relevant law, (3) the respective desirability of resolving controversies in each locale, and (4) the relationship of each community to the controversy." *George & Co. LLC v. Target Corp.*, No. 20 C 6219, 2021 WL 2948910, *2 (N.D. Ill. July 14, 2021) (ruling on 28 U.S.C § 1404(a) motion) (citation omitted); *see also Murphy v. Plunkett*, No. 18-CV-5146, 2018 WL 11445789 (N.D. Ill. Sept. 24, 2018) ("Section 1404(a) is merely a codification of the doctrine of forum non conveniens for the subset of cases in which the transferee forum is within the federal court system[.]") (quoting *Atl. Marine Corp. Co.*, 571 U.S. at 60). The parties do not address whether adjudicating this dispute in Delaware state court will delay the case and instead mainly argue over whether this dispute is truly local to Illinois.

The Court concludes that the last three factors—and common sense—weigh strongly in favor of dismissal. This case will likely rest almost entirely on Delaware law, and the parties are not citizens of Illinois (QuiO is, in fact, a Delaware limited liability corporation). Dahmani is bringing common law breach of fiduciary duty claims, a derivative action under the Delaware LLC Act, and is seeking remedies under Delaware law. Further, as stated above, this case will likely require interpretation of the SHL Group and QuiO contracts, which have choice of law provisions that require courts to apply Delaware law. Although Dahmani asserts that this court is competent to apply Delaware law, his claims and the relief he seeks strongly suggest that this dispute should be heard in Delaware. *Pinkus v. Sirius XM Radio Inc.*, 255 F. Supp. 3d 747, 752 (N.D. Ill. 2017) ("Because New York law applies, the public interest favors a New York forum."). Moreover, in the

parties' briefing (in response to SHL Medical's 12(b)(6) motion), the parties rely almost exclusively on Delaware law, underscoring Delaware's connection to claims at issue. Adjudicating this dispute in Delaware thus makes far more sense.

The Court further finds that Illinois has no particular stake in or relationship to this dispute. Dahmani contends that Illinois has a local interest because Dahmani was an Illinois resident during many of the events underlying his claims, QuiO's initial investors were mainly from Illinois and Michigan, and SHL Group and QuiO's relationship arose in Chicago. (Dkt. 37 at 2.) Dahmani further argues that Illinois has a local interest because the other two QuiO founders were originally from the Chicago area and nearby Indiana. (*Id.*) Most of these allegations are inapposite, if not harmful to Dahmani's assertion that this dispute is Illinois-centric; Dahmani, at most, describes a Midwestern or national affair with international dimensions. The Complaint, for example, suggests that QuiO's development occurred in Taiwan and Florida, (Dkt. 37 ¶¶ 35, 39), and is silent on where the QuiO Board Meetings were held. These facts (and lack thereof) undercut Dahmani's conviction that this dispute is so localized to Illinois such that venue is appropriate here. Rather, the Court finds that Delaware is the most natural venue for this dispute.

In short, Delaware is an alternative forum, the private interests here are neutral with respect to keeping the dispute in Illinois, and the public interest factors, in contrast, weigh heavily in favor of adjudicating this matter in Delaware. The Court therefore finds that dismissal is warranted under the forum non conveniens doctrine.

As the Court's application of the relevant forum selection clauses and the forum non conveniens analysis both strongly suggest that dismissal of this case is warranted, Dahmani's Complaint is dismissed.

### Conclusion

For the foregoing reasons, the Court grants SHL Medical's motion to dismiss for forum non conveniens. Civil case terminated.

ENTERED: 6/14/24

_Nancy L. Maldonado_
_____
Nancy L. Maldonado
United States District Court Judge

9